IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

PATRICK BAEHR, *et al.,*          *

                             *

      Plaintiffs,                    Civil Action No. RDB-13-0933

                             *

      v.                                     *

THE CREIG NORTHROP TEAM,
  P.C., *et al.,*                *

      Defendants.           *

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## MEMORANDUM OPINION

The Plaintiffs Patrick and Christine Baehr, individually and on behalf of a class of consumers, bring this single-count class action[1] against the Defendants The Creig Northrop Team, P.C. ("The Northrop Team"), Creighton Edward Northrop, III ("Creig Northrop"), Lakeview Title Company ("Lakeview"), and Lindell Eagan ("Eagan") (collectively, the "Defendants"), alleging that the Defendants violated the Real Estate Settlement Procedures Act of 1974, as amended, 12 U.S.C. § 2601, *et seq.* ("RESPA") through an illegal kickback scheme whereby The Northrop Team received unearned fees from Lakeview Title in exchange for referring clients to Lakeview Title for settlement. Currently pending before this Court is the Defendants' Joint Motion for Summary Judgment, arguing that the Plaintiffs do not have standing to bring their claim, and that their claim is barred by RESPA's one year statute of limitations and equitable tolling does not apply. (ECF No. 158.)

---

[1] As noted *infra* Note 10, this case has been previously assigned to four other Judges of this Court. It was assigned to the undersigned on November 30, 2017 and discovery was ultimately completed giving rise to the filing of dispositive motions.

This Court reviewed the parties' submissions and held a motions hearing on November 20, 2018. For the following reasons, Defendants' Joint Motion for Summary Judgment (ECF No. 158) is GRANTED and Judgment is ENTERED in favor of Defendants.[2]

## BACKGROUND

In ruling on a motion for summary judgment, this Court reviews the facts and all reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Hardwick ex rel. Hardwick v. Heyward*, 711 F.3d 426, 433 (4th Cir. 2013). As explained below, in 2008 the named Plaintiffs Patrick and Christine Baehr (the "Plaintiffs" or "Baehrs") retained Long & Foster Real Estate, Inc. ("Long & Foster") as their real estate broker to assist them in finding a new home. Maija Dykstra, at the time a Long & Foster agent and member of the Defendant The Creig Northrop Team, P.C. ("The Northrop Team"), led by the Defendant Creighton Edward Northrop, III ("Creig Northrop"), referred the Plaintiffs to the Defendant Lakeview Title Company ("Lakeview Title"), run by its President Defendant Lindell Eagan ("Eagan"), for settlement. The Baehrs closed on the purchase of this home on July 25, 2008.

On March 27, 2013, more than four and a half years after they settled on their home, the Plaintiffs filed the instant suit on behalf of themselves and a putative class, claiming that the Defendants violated Section 8(a) of RESPA by using a "sham" marketing agreement between The Northrop Team and Lakeview Title to disguise an illegal kickback scheme whereby The Northrop Team received unearned fees by referring the Plaintiffs and the

---

[2] Accordingly, Plaintiffs' Motion to Revise Judgment and for Leave to file a Second Amended Complaint (ECF No. 160) and Plaintiffs' Motion to Modify the Class (ECF No. 228) are MOOT.

putative class to Lakeview Title for settlement. This Court begins with a brief overview of RESPA before detailing the factual and procedural background of this case.

## I.  The Real Estate Settlement Procedures Act ("RESPA")

Congress enacted the Real Estate Settlement Procedures Act of 1974, as amended, 12 U.S.C. § 2601, *et seq.* ("RESPA") after it found that substantial reforms in the real estate settlement process were "needed to insure that consumers throughout the Nation are provided with greater and more timely information on the nature and costs of the settlement process and are protected from unnecessarily high settlement charges caused by certain abusive practices that have developed in some areas of the country." 12 U.S.C. § 2601(a). Accordingly, Congress enacted RESPA to effect "certain changes" that would result "in the elimination of kickbacks or referral fees that tend to increase unnecessarily the costs of certain settlement services."[3] *Id.* at § 2601(b)(2).

One of RESPA's prohibitions is that "[n]o person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person." *Id.* at § 2607(a). RESPA then provides for a specific set of remedies, including that "[a]ny person or persons who violate the prohibitions or limitations of this section shall be jointly and severally liable to the person or persons charged for the settlement service involved in the violation in an amount equal to three times the amount of any charge paid for such settlement service." *Id.* at §

---

[3] The other purposes of RESPA include effecting certain changes to result in: "more effective advance disclosure to home buyers and sellers of settlement costs," "a reduction in the amounts home buyers are required to place in escrow accounts established to insure the payment of real estate taxes and insurance," and "significant reform and modernization of local recordkeeping of land title information." 12 U.S.C. § 2601(b).

2607(d)(2). RESPA does not provide, however, an individual with a private right to injunctive relief. *See id.* at § 2607(d)(4) ("The Bureau, the Secretary, or the attorney general or the insurance commissioner of any State may bring an action to enjoin violations of this section."); *see also Minter v. Wells Fargo Bank, N.A.*, 593 F. Supp. 2d 788, 796 (D. Md. 2009) ("[T]his Court finds that there is no private right to injunctive relief under RESPA.")

## II. The Marketing Agreement between The Northrop Team and Lakeview Title

On April 10, 2008, Creig Northrop and The Northrop Team entered into a Marketing and Services Agreement. (ECF No. 210-10.) The Agreement provided that, among other things, Northrop agreed to designate Lakeview Title as its "exclusive preferred settlement and title company" and "to provide certain marketing services." (*Id.* at ¶ 2.1.) In exchange, Lakeview would pay The Northrop Team a flat fee of $6,000 per month, "not predicated on the volume of applications received by Lakeview from Northrop customers for settlement and title services." (*Id.* at 14.) Finally, the parties agreed "that the terms of the transaction described herein is of a confidential nature and shall not be disclosed except to consultants, advisors and Affiliates, or as required by law. Neither the parties shall make any public disclosure of the specific terms of this Agreement, except as required by law." (*Id.* at ¶ 9.21.)

## III. The Named Plaintiffs' purchase of their home with Long & Foster and The Northrop Team

The Named Plaintiffs Patrick and Christine Baehr's RESPA claim stems from their purchase of a home in Glenwood, Maryland ("Glenwood home") on July 25, 2008. (ECF No. 158-3.) In April of 2008, the Baehrs entered into an Exclusive Right to Represent Buyer

Agreement with Long & Foster to assist them in selling their previous home and finding a new home. (ECF No. 158-8.) The Defendant Creig Northrop is a licensed real estate agent who provides real estate brokerage services under Long & Foster's real estate brokerage license.[4] Creig Northrop also runs The Northrop Team, a real estate agent team, along with his wife Carla Northrop. Maija Dykstra, a Northrop Team Member at the time, was the Long & Foster real estate agent who assisted the Baehrs in the selling and purchase of their home. (P. Baehr Dep., ECF No. 158-4 at 94.)[5]

When the Baehrs began working with The Northrop Team, they received promotional materials for various companies, including Lakeview Title, and a folder of various forms to be signed. (ECF No. 158-12.) Among the forms to be signed were an Understanding Whom Real Estate Agents Represent Form and an Affiliated Business Arrangement ("ABA") Disclosure Statement. (*Id.* at 8-9; ECF No. 210-31.) The ABA Disclosure Statement, given to the Baehrs by Dykstra, was a Long & Foster form which gave clients "notice that Long & Foster Real Estate, Inc. ('Long & Foster') has business relationships (e.g., direct or indirect ownership interests, joint ventures and/or contractual relationships including marketing agreements and/or office leases) with the following mortgage, title, closing, and insurance service providers."[6] (ECF No. 210-31.) Under closing

---

[4] Under Maryland state law, all real estate agents must be licensed and affiliated with a licensed real estate brokerage for the purpose of providing real estate brokerage services. *See* Md. Code. Ann., Bus. Occ. & Prof., § 17-310(b) (salespersons must be affiliated with a real estate brokerage that is headed by a broker, and offer real estate brokerage services through that brokerage).

[5] "P. Baehr Dep." refers to the deposition testimony of Plaintiff Patrick Baehr while "C. Baehr Dep." refers to the deposition testimony of Plaintiff Christine Baehr.

[6] As explained in more detail below, RESPA permits affiliated business arrangements so long as certain conditions are met, including disclosure of the existence of such an arrangement to the person being referred. 12 U.S.C. § 2607(c). RESPA defines an ABA as "an arrangement in which (A) a person who is in a position to refer business incident to or a part of a real estate settlement service involving a federally related mortgage loan, or an associate of such person, has either an affiliate relationship with or a direct or beneficial ownership

and title insurance companies, the Long & Foster Disclosure Statement listed twelve companies and their affiliates in which Long & Foster had a business relationship.[7] (*Id.*)

Maija Dykstra assisted the Baehrs in finding and ultimately making an offer for the purchase of the Glenwood home for $835,000. (P. Baehr Dep., ECF No. 158-4 at 110; HUD-1, ECF No. 158-3.) From previous experience purchasing a home, the Baehrs understood that once a purchase price was agreed upon, they needed a settlement company and title insurance to complete the purchase.[8] (ECF No. 158-4 at 132; C. Baehr Dep., ECF No. 158-14 at 80, 82.) Both Patrick and Christine Baehr testified that while working with Long & Foster and The Northrop Team, they knew and understood that they could choose their own settlement and title company. (ECF No. 158-4 at 137; ECF No. 158-14 at 82.) Despite knowing that they were free to choose their own company, however, the Baehrs did not take any action to find their own settlement and title company. (ECF No. 158-4 at 134, 137.) Rather, Patrick Baehr testified that he expected his Northrop Team Member, Dykstra, to find him a settlement company. (*Id.* at 138.)

---

interest of more than 1 percent in a provider of settlement services; and (B) either of such persons directly or indirectly refers such business to that provider or affirmatively influences the selection of that provider." *Id.* at § 2602(7).

[7] Specifically, the form stated that Long & Foster had business relationships with the following companies to close a purchase or sale and/or for title insurance:

      RGS Title and/or its affiliate Mid-States Title of Virginia, LLC
      Brennan Title Company and/or its affiliate Positive Title, LLC
      MBH Settlement Group LC and/or its affiliate Eastern Title LLC
      Saga Title Group, LLC
      Settlement Professionals, LLC
      Bon Air Title and/or its affiliate Bon Air/Long & Foster Title Agency, LLC
      Shaheen & Shaheen and/or its affiliate Long & Foster Great American Title, LLC
      Shaffer Title & Escrow Inc. and/or its affiliate Long & Foster Shaffer Title Services, LLC
      Homestead Settlement Services, LLC and/or its affiliate Mid-States Title of Roanoke, LLC
      Mid States Title of Southwest Virginia, LLC
      Trump & Trump and/or its affiliate Long 7 Foster of WV Title Insurance Agency, LLC
      Long & Foster Settlement Services, LLC

[8] Specifically, in 2000 the Baehrs purchased a home for around $310,000 and paid $375 to the title company Residential Title & Escrow Company. (ECF No. 158-4 at 229, 230.)

Thereafter in July of 2008, the month the Baehrs closed on their home, Dykstra informed the Baehrs that Lakeview Title would handle their settlement. (P. Baehr Dep., ECF No. 158-4 at 138; C. Baehr Dep., ECF No. 158-14 at 98.) Specifically, Patrick Baehr testified that Dykstra stated "we do all of our settlements at Lakeview." (ECF No. 158-4 at 139.) It is undisputed that when Dykstra informed the Baehrs that "we do all of our settlements at Lakeview," the Baehrs did not ask a single question regarding why a Northrop Team Member, associated with Long & Foster, would refer all settlements to Lakeview Title. They also did not ask whether Dykstra, Long & Foster, or The Northrop Team had an affiliation or some form of an agreement with Lakeview Title. (P. Baehr Dep., ECF No. 158-4 at 138-41.) This was despite the fact that Lakeview Title was not one of the twelve closing or title insurance companies listed on Long & Foster's ABA Disclosure Statement and that Lakeview Title was not the title company the Baehrs used when settling on their previous home. (ECF Nos 210-31; ECF No. 158-4 at 229, 230.)

Rather, the Baehrs elected to proceed with Lakeview Title handling their settlement without objection. Subsequently, on July 25, 2008, the Baehrs obtained title insurance from and settled on the Glenwood home with Lakeview Title. (HUD-1, ECF No. 158-3.) Patrick Baehr testified that despite feeling comfortable and having the opportunity to ask questions during the closing process, he did not recall asking any questions. (ECF No. 158-4 at 167-68.) The Baehrs' HUD-1[9] for the purchase of their home then listed the following fees, among others, paid from borrower's funds at settlement:

|  |  |
|---|---|
| Contract sales price: | $835,000.00 |

---

[9] The HUD-1 Settlement Statement is a standard form indicating fees charged to a borrower by a mortgage lender or broker.

| Administrative Fee to Long & Foster: | $395.00 |
| Title Examination to Lakeview Title Company: | $375.00 |
| Title insurance binder to Lakeview Title Company: | $50.00 |
| Title Insurance to Chicago Title Insurance Company: | $2,990.00 |
| Recording Services to Lakeview Title Company: | $50.00 |

(HUD-1, ECF No. 158-3.) As Chicago Title Insurance Company was the title underwriter, that amount was also sent to Lakeview Title. (ECF No. 158-1 at 11 n. 11.)

After the settlement process, Patrick Baehr testified that he was satisfied with the services that Lakeview Title provided. (P. Baehr Dep., ECF No. 158-4 at 164; C. Baehr Dep., ECF No. 158-14 at 128.) Accordingly, he believed that Lakeview Title deserved to be compensated in connection with the settlement services and did not object to paying Lakeview Title or Chicago Title Insurance Company's fee. Satisfied with their srvices, over the next four and a half years, the Baehrs did not contact Dykstra, Creig Northrop, anyone on the Northrop Team, Lakeview, or Long & Foster about whether The Northrop Team may have had a marketing agreement or other arrangement with Lakeview Title, or whether The Northrop Team may have received anything of value from Lakeview Title in connection with the Baehrs' purchase of the Glenwood home. (P. Baehr Dep., ECF No. 158-4 at 206.)

## IV. Four and a half years later, the Plaintiffs file the instant action

On March 15, 2013, four and a half years after the Baehrs purchased their home, the Baehrs received a letter from their current counsel. (ECF No. 158-16.) The letter indicated that counsel was "investigating whether you and other persons similarly situated may have a legal claim based on illegal kickbacks paid for the referral of your business to a title company that settled your purchase. . . . I believe that you may be entitled to financial recovery under RESPA." (*Id.*) Subsequently, the Baehrs received a written engagement letter to pursue the

instant claim. (ECF No. 158-17.) On March 27, 2013, they filed the instant action, alleging that the Defendants violated Section 2607(a) of RESPA.[10] (Compl., ECF No. 1.)

The Plaintiffs' Complaint named six Defendants: The Northrop Team, Creig Northrop, Carla Northrop, Lakeview Title, Lindell Eagan, and Long & Foster. (*Id.*) The Complaint alleged that Creig Northrop, Carla Northrop, and The Northrop Team—acting as agents on behalf of Long & Foster—referred the Plaintiffs and members of the Class exclusively to Defendant Lakeview Title Company for real estate settlement services as a *quid pro quo* for compensation by Lakeview Title and Lindell Eagan, President of Lakeview. The Plaintiffs alleged that the Defendants concealed this *quid pro quo* or kickback relationship first through a "sham" employment agreement between Carla Northrop and Lakeview Title from around 2001 through 2008, and then through the Marketing and Services Agreement described above from 2008 through 2013.

With respect to the Marketing Agreement, the Plaintiffs' Complaint alleged that rather than Creig Northrop and The Northrop Team receiving a flat fee for marketing services of $6,000 per month from Lakeview Title, the payments they received actually fluctuated from $6,000 to $12,000 based on how many clients The Northrop Team referred to Lakeview.[11] Therefore, the Plaintiffs alleged that the Marketing Agreement was a sham, designed to hide illegal kickback fees under Section 8(a) of RESPA.

---

[10] Since this case was initially assigned to Judge Bredar on March 27, 2013, it has been subsequently reassigned to Judge Nickerson that same day, to Judge Quarles on May 6, 2013, to Judge Motz on January 27, 2016, to Judge Russell on October 13, 2016, and finally to the undersigned on November 30, 2017.

[11] As explained below, the Plaintiffs now assert that discovery has shown that the kickback The Northrop Team received for referrals to Lakeview Title was 50% of the title insurance premium. In the Baehrs' case, that was around $1,495. (Pls' Opp., ECF No. 210 at ¶ 18.)

## V.     This Court's previous rulings

On May 13, 2013, the Defendants filed two Motions to Dismiss the Plaintiffs' Complaint on various grounds. (ECF Nos. 23, 26.) Subsequently, the Plaintiffs filed a Motion to Amend the Complaint and Motion for Class Certification. (ECF Nos. 36, 44.) On January 29, 2014, the Honorable Judge William D. Quarles, Jr. ruled on the Motions. (ECF Nos. 57, 58; *Baehr v. Creig Northrop Team, P.C.*, 2014 WL 346635 (D. Md. Jan. 29, 2014).) The relevant rulings are explained below.[12]

### a.  The Plaintiffs adequately alleged that equitable tolling applied to their RESPA claim

The Defendants moved to dismiss the Complaint on the ground that the Plaintiffs' claim was barred by RESPA's statute of limitations. *Baehr*, 2014 WL 346635, at *4. As this Court explained, a claim brought pursuant to Section 8 of REPSA, 12 U.S.C. § 2607, is subject to a one-year statute of limitations, which may be equitably tolled. *Id.* (citing 12 U.S.C. § 2614). Because the Plaintiffs closed on their home on July 25, 2008 but did not file their Complaint until March 27, 2013, their claim fell well outside the one-year statute of limitations. *Id.* To determine whether the Plaintiffs adequately pled that their claim was entitled to equitable tolling, this Court applied the following standard:

> To invoke the doctrine of equitable tolling, the Plaintiffs must show that "(1) the party pleading the statute of limitations fraudulently concealed facts that are the basis of the plaintiff's claim, and (2) the plaintiff failed to discover those facts within the statutory period, despite (3) the exercise of due diligence."

---

[12] In addition to the rulings described below, this Court also held that the Plaintiffs adequately pled a claim against Lindell Eagan.

*Id.* (citing *Minter v. Wells Fargo Bank, N.A.,* 675 F .Supp. 2d 591, 596 (D. Md. 2009)).[13]

Applying this standard, this Court held that the Plaintiffs sufficiently alleged "that the Defendants engaged in affirmative acts to conceal the kickback scheme." 2014 WL 346635, at *5. Specifically, the Plaintiffs alleged that the Defendants concealed the fact that the Northrop Defendants were receiving illegal referral fees by disguising the kickback payments in the sham employment and marketing agreements. *Id.* Moreover, this Court explained that whether the Defendants were required to disclose the "employment or affiliation agreements is irrelevant in determining whether the Defendants fraudulently concealed violations of RESPA by entering into sham agreements. The issue is not whether the agreements were disclosed, but whether they were created as shams to hide payments in violation of RESPA." *Id.* at *5 n. 9. Briefly addressing due diligence, this Court reasoned that reasonable inquiry would not have revealed the RESPA claim because anyone who inquired into the agreements would have discovered only the seemingly valid employment or marketing agreements. *Id.* at *5.

### b. The Plaintiffs failed to state a claim against Carla Northrop and Long & Foster

The Defendants also moved to dismiss Long & Foster and Carla Northrop for failure to state a claim. *Baehr*, 2014 WL 346635, at *5-6. As to Long & Foster, this Court held that the Plaintiffs' allegations concerning an agency relationship between the Northrop Defendants and Long & Foster were mere legal conclusions and failed to allege "the basis, nature, or extent of the relationship." *Id.* at *6. As to Carla Northrop, this Court held that

---

[13] This standard for equitable tolling pre-dated the Supreme Court's current equitable tolling standard announced in *Menominee Indian Tribe of Wisconsin v. United States*, ⸺ U.S. ⸺, 136 S. Ct. 750 (2016).

the proposed Amended Complaint failed to allege that Carla Northrop in fact gave or accepted a kick back in 2008 when the Baehrs purchased their home. *Id.* at *5. Therefore, this Court dismissed both Long & Foster and Carla Northrop.[14]

### c. Class certification was appropriate, but on narrower grounds than requested

Turning to the Plaintiffs' Motion for Class Certification, the Plaintiffs sought to certify the following class:

> All Maryland residents who retained Long & Foster Real Estate, Inc., Creighton Northrop, III, and the Creig Northrop Team, P.C. to represent them in the purchase of a primary residence between January 1, 2000 to present and settled on the purchase of their primary residence at Lakeview Title Company, Inc.

(ECF No. 44.)

Analyzing the factors in Federal Rule of Civil Procedure 23(a), this Court held that the Plaintiffs had met the numerosity and commonality requirements. *Baehr*, 2014 WL 346635, at *8. As to typicality, however, this Court held that the Baehrs' claim was not typical with potential class members' claims originating between 2000 and 2007, when the Defendants were allegedly operating their kickback scheme through Carla Northrop's employment with Lakeview Title. *Id.* at *8-9. Therefore, this Court redefined the class to only include those class members who purchased homes beginning in 2008. *Id.* at *9. This

---

[14] Although nothing in this Court's Order indicates that the dismissals were with prejudice, the parties assumed—and in a subsequent Opinion this Court indicated—that the dismissals were with prejudice. *See Baehr v. Creig Northrop Team, P.C.*, 2014 WL 3725906, at *4 (D. Md. July 24, 2014) ("The Plaintiffs seek to amend the Court's dismissal of the claim against Long & Foster to be without prejudice.") Subsequently, on February 13 and 14, 2014, the Plaintiffs filed Motions to file a Second Amended Complaint and to Alter/Amend Judgment, seeking to (1) amend this Court's dismissal of the claim against Long & Foster to be without prejudice and (2) filed a second amended complaint to add specific factual allegations against Long & Foster. (ECF Nos. 65, 66.) Judge Quarles denied both Motions, again holding that Plaintiffs failed to state a claim against Long & Foster. (ECF Nos. 84, 85; *Baehr v. Creig Northrop Team, P.C.*, 2014 WL 3725906 (D. Md. July 24, 2014).)

Court then held that the adequacy prong was met, as well as the predominance and superiority requirements of Rule 23(b). *Id.* at *9-11.

Therefore, this Court certified the following amended class:

All Maryland residents who retained Long & Foster Real Estate, Inc., Creighton Northrop, III, and the Creig Northrop Team, P.C. to represent them in the purchase of a primary residence between January 1, 2008 to the present and settled on the purchase of their primary residence at Lakeview Title Company, Inc.

*Id.* at *11; ECF No. 58. Defining the class in this time period precluded the Plaintiffs from proceeding with their claim that Defendants' RESPA violations began before 2008 through Carla Northrop's "sham" employment agreement with Lakeview Title. Subsequently, the Plaintiffs filed the Operative Amended Complaint. (ECF No. 89.)

## VI.    The Defendants' Joint Motion for Summary Judgment

On June 9, 2015, the Defendants filed a Joint Motion for Summary Judgment. (ECF No. 158.) The Motion argues that the Defendants are entitled to judgment as a matter of law on two grounds: (1) Plaintiffs do not have Article III standing to bring their Section 8(a) RESPA claim because they do not satisfied the injury in fact requirement; and (2) discovery has shown that the Plaintiffs failed to file this action within RESPA's one year statute of limitations, and their claim is not entitled to equitable tolling.

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(c), a court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 247 (1986). A material fact is one that "might affect the outcome of the suit under the governing law." *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Anderson*, 477 U.S. at 248). The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine dispute of material fact, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), and the court must take all facts and inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

The party opposing summary judgment must, however, "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also In re Apex Express Corp.*, 190 F.3d 624, 633 (4th Cir. 1999). The non-movant "'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)); *see also Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 160 (1970). A court should enter summary judgment when a party fails to make a showing sufficient to establish elements essential to a party's case, and on which the party will bear the burden of proof at trial. *Celotex Corp.*, 477 U.S. at 322-23.

## ANALYSIS

The Plaintiffs argue that the Defendants violated Section 8(a) of RESPA by using the "sham" Marketing and Services Agreement between The Northrop Team and Lakeview Title to disguise an illegal kickback scheme whereby The Northrop Team received unearned fees from Lakeview Title in exchange for referring the class of Plaintiffs to Lakeview Title for settlement. Specifically, the Plaintiffs assert that half of the "Title Insurance" Fee on

every Plaintiffs' HUD, in the Baehrs' case the Title Insurance fee of $2,990.00, was channeled back to The Northrop Team in exchange for the referral to Lakeview. In their Joint Motion for Summary Judgment, the Defendants argue that they are entitled to judgment as a matter of law on Plaintiffs' claim because the Plaintiffs do not have standing under Article III of the Constitution, and discovery has shown that their claim is not entitled to equitable tolling.

## I.    The Plaintiffs do not have Article III Standing

Federal jurisdiction under Article III of the United States Constitution is limited to "Cases" and "Controversies." U.S. CONST. ART. III, § 2. "One element of the case-or-controversy requirement is that plaintiffs must establish that they have standing to sue." *Clapper v. Amnesty Int'l USA*, __ U.S. __, 133 S. Ct. 1138 (2013). The "irreducible minimum requirements" of standing that a plaintiff bears the burden of establishing are (1) an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. *Spokeo, Inc. v. Robinson*, 136 S. Ct. 1540, 1547 (2016) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S. Ct. 2130 (1992)); *David v. Alphin*, 704 F.3d 327, 333 (4th Cir. 2013).

It has been long settled "that Congress cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing." *Raines v. Byrd*, 521 U.S. 818, 820, 117 S. Ct. 2312 (1997). The United States Supreme Court most recently reaffirmed this principle in *Spokeo, Inc. v. Robinson*, __ U.S. __, 136 S. Ct. 1540 (2016) when explaining that "Congress' role in identifying and elevating intangible harms does not mean that a plaintiff automatically satisfies the injury-in-fact

requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right." 136 S. Ct. at 1549. Rather, a plaintiff must still establish "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* at 1548 (citing *Lujan,* 504 U.S. at 560). In other words, "a bare procedural violation, divorced from any concrete harm" does not satisfy the injury-in-fact requirement. *Id.* at 1549.

The Plaintiffs do not dispute that the $2,990.00 they paid for Title Insurance to Chicago Title Insurance Company—which they assert was in some part channeled back to the Northrop Defendants—was a reasonable fee to pay for title insurance, and therefore they were not overcharged for services. Rather, the Plaintiffs argue that they have standing to bring their RESPA claim because they were "deprived of impartial and fair competition between settlement services." (Am. Compl., ECF No. 89 at ¶ 23; P. Baehr Dep., ECF No. 158-4 at 248.) In response, the Defendants argue that Section 8(a) of RESPA does not protect "impartial and fair competition" in this context and Plaintiffs did not suffer a concrete harm under Article III.

In arguing that being deprived of "impartial and fair competition" is sufficient to establish Article III standing in this case, the Plaintiffs rely on this Court's rulings in *Robinson v. Fountainhead Title Group Corp.*, 447 F. Supp. 2d 478 (D. Md. 2006) and *Fangman v. Genuine Title, LLC*, No. RDB-14-0081, 2015 WL 8315704 (D. Md. Dec. 9, 2015). First of all, both of these cases pre-date the Supreme Court's ruling in *Spokeo*. Secondly, both are distinguishable from the facts of this case because they involved allegations of overcharging and the creation

of sham companies or a controlled or affiliated business agreement to assist in the kickback scheme.

In *Robinson*, the plaintiff alleged that the defendants Fountainhead Title Group Corporation, Long & Foster, and Mid-States Title Insurance Agency, Inc. established a sham limited liability company, Assurance Title, LLC, to appear on closing documents for allegedly completing title services. 447 F. Supp. 2d at 485. The plaintiff alleged that in reality, Fountainhead completed the title services and the fee the borrowers paid Assurance were channeled to Long & Foster and Mid-States pursuant to an agreement to refer closing and settlement services to Fountainhead. *Id.* at 485-86. The defendants moved to dismiss, arguing that the plaintiff was required to allege an "overcharge" in order to have standing under Section 8(a) of RESPA. *Id.* at 486. This Court denied the motion, holding that the plaintiff had standing first because the plaintiff had in fact alleged an overcharge. *Id.* at 488. Second, this Court relied on RESPA's legislative history with respect to concerns regarding controlled business arrangements to conclude that "in addition to the overcharges alleged, the alleged § 8(a) violation presents the possibility for other harm, including a lack of impartiality in the referral and a reduction of competition between settlement service provides." *Id.* at 488-89.

Similarly in *Fangman v. Genuine Title, LLC*, No. RDB-14-0081, 2015 WL 8315704 (D. Md. Dec. 9, 2015), the plaintiffs alleged that the defendant Genuine Title, LLC, by itself and through sham companies, provided cash payments and marketing materials to mortgage brokers who then referred their client to Genuine Title for settlement services. 2015 WL 8315704, at *1. The plaintiffs claimed that the cash payments were concealed from them and

not disclosed on their HUD-1s, and Genuine Title failed to disclose their affiliated business relationships. *Id.* at *3. When the defendants moved to dismiss for lack of standing, this Court held that the plaintiffs satisfied the actual injury requirement when they alleged that "as a result of Defendants' kickback scheme, they 'were deprived of kickback free settlement services and process' and that '[b]ut for' the kickback scheme, their settlement fees 'would have been much lower.'" *Id.* at *5.

Unlike in *Robinson* and *Fangman*, it is undisputed from the fully developed record and oral argument at the hearing of November 20, 2018 that the $2,990.00 figure the Plaintiffs allege was in some part channeled back to the Northrop Defendants was a reasonable fee to pay for title insurance. Accordingly, there is no genuine dispute of material fact that the Plaintiffs were not in any way overcharged for services due to the alleged kickback scheme. Therefore, while RESPA was enacted, in part, to result "in the elimination of kickbacks or referral fees that tend to increase unnecessarily the costs of certain settlement services," Plaintiffs have not shown that the costs of settlement services were unnecessarily increased. 12 U.S.C. § 2601(b).

Moreover, it is undisputed that the Defendants did not create a sham company to orchestrate the alleged scheme and there was not a controlled or affiliated business agreement between The Northrop Team and Lakeview Title. The Plaintiffs repeatedly emphasize that Lakeview Title was not one of the twelve closing and title insurance companies listed on Long & Foster's ABA Disclosure Statement. However, that was a form prepared by Long & Foster, not The Northrop Team, in which the Defendants assert Long & Foster voluntarily disclosed "business relationships" it had with twelve closing or title

insurance companies. (ECF No. 210-31; Defs.' Rep., ECF No. 212 at 21.) Second, under RESPA, neither Long & Foster nor The Northrop Team had an affiliated business arrangement with Lakeview Title that required disclosure. RESPA defines an affiliated business arrangement as:

> An arrangement in which (A) a person who is in a position to refer business incident to or a part of a real estate settlement service involving a federally related mortgage loan, or an associate of such person, has either an affiliate relationship with or a direct or beneficial ownership interest of more than 1 percent in a provider of settlement services; and (B) either of such persons directly or indirectly refers such business to that provider or affirmatively influences the selection of that provider.

12 U.S.C. § 2602(7). RESPA's controlling regulations then define "affiliate relationship" as

> The relationship among business entities where one entity has effective control over the other by virtue of a partnership or other agreement or is under common control with the other by a third entity or where an entity is a corporation related to another corporation as parent to subsidiary by an identity of stock ownership.

12 C.F.R. § 1024.15(c). The Plaintiffs do not direct this Court to any evidence that The Northrop Team, or Long & Foster, had an affiliated business arrangement under RESPA with Lakeview Title that required disclosure.[15] Accordingly, to the extent this Court in *Robinson* and *Fangman* relied on RESPA's concerns regarding controlled or affiliated business arrangements, and therefore credited a deprivation of impartiality and fair competition as a potential injury, those interests are not at issue here.

Looking at the undisputed facts, Plaintiffs knew at the time they put an offer in for the Glenwood home that they could choose their own settlement and title company. Rather

---

[15] Rather, the Plaintiffs direct this Court to an email sent to "executives@northropteam.com" which included an internal memo that referred to Lakeview Title as an "affiliate." (ECF No. 210-32.) This internal reference to Lakeview Title as an "affiliate," however, is insufficient to establish a genuine issue of material fact that The Northrop Team had "either an affiliate relationship with" as defined by 12 C.F.R. § 1025.14(c) above, or "a direct or beneficial ownership interest of more than 1 percent in" Lakeview Title. 12 U.S.C. § 2602(7).

than shop for their own company, however, they elected to continue with Lakeview Title even after Maija Dykstra told them that "we do all of our settlements at Lakeview." Therefore, despite the currently alleged interest in "fair and impartial competition between settlement services," the Plaintiffs took no action at the time to find their own settlement company or inquire further into the settlement company recommended to them. Moreover, the Plaintiffs do not claim that they were at all dissatisfied with the services Lakeview Title provided. Finally, the Plaintiffs also do not claim that the fees paid to Lakeview Title, including portions that are alleged to have been channeled to The Northrop Team, were unreasonable or undeserved. Plaintiffs chose to follow the referral to Lakeview Title, were satisfied with the services they received, and paid a reasonable fee. In light of all of these undisputed facts, the Plaintiffs cannot now allege that they satisfy Article III's injury in fact requirement because they were deprived of "impartial and fair competition between settlement services."

Finally, although not asserted in the Amended Complaint, the Plaintiffs also argue in their Response to the Motion for Summary Judgment that they were injured because "they paid for a service—the impartial advice and advocacy of their fiduciaries—that they did not receive." (Pls.' Resp., ECF No. 210 at 33.) This theory, however, also contradicts the undisputed facts for several reasons. First, Patrick Baehr testified that he and his wife did not discuss with anyone on The Northrop Team the topic of finding a settlement and title company. This was consistent with the Exclusive Right to Represent Buyer Agreement with Long & Foster providing that the Baehrs retained Long & Foster "in the acquisition of real property," including "any purchase, option, exchange or lease of property or an agreement

to do so," and not for any "other professional service." (ECF No. 158-8.) Accordingly, finding a settlement company was not a service the Plaintiffs actively solicited or bargained for from Long & Foster or The Northrop Team. Second, before choosing to continue with Lakeview Title, Maija Dykstra indicated that a relationship of some nature existed between The Northrop Team and Lakeview Title when she stated "we do all of our settlements at Lakeview." Still, the Plaintiffs did not inquire into why The Northrop Team always referred settlements to Lakeview Title or in any way inquired into the referral. Finally, by electing to proceed with Lakeview Title, the Plaintiffs received settlement services they were satisfied with and thought deserved to be compensated. Therefore, the Plaintiffs cannot now assert that they relied on, or were injured by a deprivation of, "impartial advice and advocacy" with respect to the Lakeview Title referral.[16]

For all of these reasons, there is no genuine dispute of material fact that the Plaintiffs assert only "a bare procedural violation, divorced from any concrete harm" and do not satisfy the injury-in-fact requirement of Article III Standing. Accordingly, Plaintiffs do not

---

[16] The Plaintiffs also argue that they "did not receive a title fee discount that they were entitled to" and under a theory of unjust enrichment, the Plaintiffs are entitled to the amount that the Defendants were unjustly enriched by with the referral to Lakeview. (Pls' Resp., ECF No. 210 at 33-34.) Beginning with the former theory, the Plaintiffs rely on *Gussin v. Shockey*, 725 F. Supp. 271, 275 (D. Md. 1989), *aff'd*, 933 F.2d 1001 (4th Cir. 1991). In that case, however, this Court granted summary judgment for the plaintiffs on their claim that the defendant violated implied fiduciaries duties as the plaintiffs' agent when he "advised them to pay prices for horses that included a secret benefit for himself and *that was in excess of the price for which he could have purchased the horses* for the [plaintiffs]." 725 F. Supp. at 275 (emphasis added). Here, even if the Plaintiffs had shown that The Northrop Team owed the Plaintiffs a fiduciary duty with respect to referral of settlement services, there is no allegation of overcharging. As to the former theory under unjust enrichment, this theory again relies on the underlying argument that the Plaintiffs paid The Northrop Team for "impartial advice and advocacy" with respect to obtaining settlement services, which this Court rejects as explained above. Moreover, unjust enrichment is an independent cause of action which is not permitted under RESPA. *See, e.g.*, *Minter v. Wells Fargo Bank, N.A.*, 593 F. Supp. 2d 788 (D. Md. 2009); *Eslick v. Cenlar, Central Loan Administration and Reporting*, No. 2:17-cv-381, 2017 WL 4836541 (E.D. Va. Oct. 3, 2017).

have standing to bring their claim, and for this reason alone the Defendants' Joint Motion for Summary Judgment is GRANTED.

## II. Alternatively, Plaintiffs' claim is barred by RESPA's statute of limitations

Claims brought pursuant to Section 8 of REPSA, 12 U.S.C. § 2607, are subject to a one year statute of limitations. Specifically, claims brought under Section 8 must be asserted within one year "from the date of the occurrence of the violation." 12 U.S.C. § 2614. In this case, the date of the occurrence of the violation refers to the date the Plaintiffs closed on their home, July 25, 2008. *Fangman v. Genuine Title, LLC,* No. CV RDB-14-0081, 2016 WL 6600509, at *4 (D. Md. Nov. 8, 2016) (quoting *Grant v. Shapiro & Burson, LLP*, 871 F. Supp. 2d 462, 470 (D. Md. 2012)). Because the Named Plaintiffs did not file suit until March 27, 2013, their claim falls outside of the one year statute of limitations.

As this Court has consistently held, however, claims brought under RESPA may be equitably tolled. *Fangman v. Genuine Title, LLC,* No. CV RDB-14-0008, 2015 WL 8315704, at *7 (D. Md. Dec. 9, 2015) (citing *United States v. Kwai Fun Wong*, —— U.S. ——, 135 S. Ct. 1625, 1630, 191 L.Ed.2d 533 (2015); *Grant v. Shapiro & Burson, LLP, et al.*, 871 F. Supp. 2d 462, 470 n.10 (D. Md. 2012)); *Bezek v. First Mariner Bank*, 293 F. Supp. 3d 528, 534 (D. Md. 2018). In *Menominee Indian Tribe of Wisconsin v. United States*, —— U.S. ——, 136 S. Ct. 750 (2016), a unanimous United States Supreme Court held that equitable tolling requires the plaintiff to establish two elements: "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing." 136 S. Ct. at 755 (quoting *Holland v. Florida,* 560 U.S. 631, 649, 130 S. Ct. 2549 (2010)); *see also Cunningham v. Commissioner of Internal Revenue*, No. 17-1433, 716 F. App'x 182 (4th Cir. Jan. 18,

2018). The Supreme Court emphasized these two requirements as distinct elements, "not merely factors of indeterminate or commensurable weight." 136 S. Ct. at 756 (citing *Pace v. DiGuglielmo,* 544 U.S. 408, 418, 125 S. Ct. 1807 (2005)). Accordingly, an insufficient showing of either diligence or extraordinary circumstances is fatal to a claim for equitable tolling. *See Lawrence v. Florida*, 549 U.S. 327, 127 S. Ct. 1079 (2007) (holding that equitable tolling did not apply solely because the petitioner "fell far short of showing extraordinary circumstances").

The extraordinary circumstance element "is met only where the circumstances that caused a litigant's delay are both extraordinary *and* beyond its control." *Menominee,* 136 S. Ct. at 756 (emphasis in original). In other words, the circumstances must combine to render "critical information . . . undiscoverable." *Gould v. U.S. H.H.S*, 905 F.2d 738, 745–46 (4th Cir. 1990) (en banc). While courts have consistently held that fraudulent concealment by the defendant is a circumstance that may justify equitable tolling, *see e.g., Supermarket of Marlinton, Inc. v. Meadow Gold Dairies, Inc.,* 71 F.3d 119, 122 (4th Cir. 1995); *Grant v. Shapiro & Burson, LLP*, 871 F.Supp.2d 462, 470 n.10 (D. Md. 2012), a RESPA violation in and of itself, is not a "self-concealing" wrong. *Minter v. Wells Fargo Bank, N.A.*, 924 F. Supp. 2d 627, 642 (D. Md. 2013).

As to due diligence, the Supreme Court has held that "the diligence prong . . . covers those affairs within the litigant's control." *Menominee Indian Tribe of Wisconsin v. United States*, –— U.S. ——, 136 S. Ct. 750, 756 (2016). This element requires "reasonable diligence," not "maximum feasible diligence." *Holland v. Florida,* 560 U.S. 631, 653, 130 S. Ct. 2549 (2010). In *Go Computer, Inc. v. Microsoft Corp.*, 508 F.3d 170 (4th Cir. 2007), the United States Court of Appeals for the Fourth Circuit explained that in the context of fraud:

To be sure, a diligent plaintiff need not engage in ceaseless inquiry when reasonable inquiry does not expose grounds for suit. But nothing in *Supermarket of Marlinton*[, 71 F.3d 119 (4th Cir. 1995)] excuses a negligent plaintiff from the diligence requirement—not even if a fraud is allegedly well-disguised. Fraud by its nature is something perpetrators take pains to disguise, and plaintiffs' notion that allegedly concealed fraud excuses the need for any diligence on plaintiffs' part would permit statutory periods to be tolled indefinitely, even when plaintiffs could reasonably be expected to bring suit.

508 F.3d at 179.[17]

The Fourth Circuit has emphasized that "equitable tolling is appropriate 'in those rare instances where—due to circumstances external to the party's own conduct—it would be unconscionable to enforce the limitation period against the party and gross injustice would result.'" *Cunningham*, 716 F. App'x 182 at 184 (internal quotation marks omitted) (quoting *Whiteside v. United States*, 775 F.3d 180, 184 (4th Cir. 2014) (en banc)). Accordingly, federal courts employ equitable tolling "sparingly," *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 96, 111 S. Ct. 453, 112 L.Ed.2d 435 (1990), as "a rare remedy to be applied in unusual circumstances." *Wallace v. Kato*, 549 U.S. 384, 396, 127 S. Ct. 1091 (2007).

The Plaintiffs assert that the Defendants violated Section 8(a) of RESPA by orchestrating a scheme whereby The Northrop Defendants received approximately half of the Title Insurance fee listed on each of the Plaintiffs' HUD-1 in unearned fees for referring the Plaintiffs to Lakeview Title for settlement. The Plaintiffs argue that their claim is entitled to equitable tolling because the Defendants fraudulently concealed this kickback scheme through the Marketing and Services Agreement which The Northrop Team did not disclose

---

[17] Although *Go Computer* was decided in the context of the statute of limitations for federal antitrust claims, like RESPA, that statute of limitations bars any action "unless commenced within four years after the cause of action accrued," which is not when a plaintiff discovers an injury, but "when a defendant *commits an act* that injures a plaintiff's business." 508 F.3d at 173 (citations omitted) (emphasis added).

to the Plaintiffs. Moreover, the Plaintiffs assert that even if the Defendants had disclosed the Agreement, the Plaintiffs would have only discovered a seemingly valid arrangement between The Northrop Team and Lakeview Title. Under these circumstances, the Plaintiffs argue they exercised reasonable diligence and therefore their claim is entitled to equitable tolling. As explained below, while, like this Court noted in *Bezek v. First Mariner Bank*, 293 F. Supp. 3d 528, 540 (D. Md. 2018), the class of Plaintiffs "may have some interest in accountability and financial compensation, Congress firmly expressed an interest in providing certainty to the real estate market when it set the RESPA statute of limitations at one year," and the Plaintiffs have not established that their claim is entitled to equitable tolling.

On the issue of whether the Defendants concealed the Marketing Agreement, Defendants present this Court with ample testimony that both The Northrop Team and Lakeview Employees were aware of the Marketing Agreement. Defendant Lindell Eagan, Corporate Designee for Lakeview Title Company, testified that Lakeview Title freely admitted to having a Marketing Agreement with The Northrop Team, although it was not practice to disclose the terms of the agreement. (ECF No. 158-18 at 157.) Kevin Yungman, a closing attorney for Lakeview from 2005 through September of 2014, testified that "it was common knowledge that Lakeview had some type of relationship with The Northrop Team" and he had "dozens" of communications with persons outside of the Northrop Team or Lakeview regarding the Marketing Agreements. (ECF No. 158-19 at 179, 181.) The Defendants also cite to several other Lakeview and Northrop employees who knew about the marketing relationship between The Northrop Team and Lakeview Title. (Barbara Cohn

Dep., ECF No. 158-21 at 36; Tracy Cotty Dep., ECF No. 158-23 at 44-45.) Moreover, the Defendants challenge the Plaintiffs' argument that the Defendants actively concealed the kickback scheme through the Marketing Agreement when the Plaintiffs never inquired into, or were aware of, the Marketing Agreement itself. (Defs.' Rep., ECF No. 212 at 15.)

Even assuming, however, that the Defendants did fraudulently conceal the kickback scheme, there is no genuine issue of material fact that the Plaintiffs failed to exercise reasonable diligence to discover their claim. The month the Beahrs closed on their home, they knew that they could choose their own settlement and title company. Despite knowing this, and the fact that they now claim that "impartial and fair competition between settlement services" was an important interest to them, the Plaintiffs did not take any action to find their own settlement and title company. Rather, before the Plaintiffs closed on their home, Dykstra informed them that Lakeview Title would handle their settlement. Moreover, she stated "we do all of our settlements at Lakeview." (ECF No. 158-4 at 139.)

Notwithstanding the apparent existence of a business relationship between The Northrop Team and Lakeview Title, the Plaintiffs did not at all inquire about a potential relationship between Lakeview and The Northrop Team. Rather, they elected to use Lakeview without objection or further inquiry. Accordingly, in light of a potential relationship between Lakeview and The Northrop Team—which the Plaintiffs repeatedly emphasize was not disclosed to the Plaintiffs on Long & Foster's ABA Disclosure Statement—the Plaintiffs took no steps to investigate the propriety of such a relationship. Even after closing on their homes, the named Plaintiffs and other members of the class went more than four and a half years satisfied with the services they received from Long & Foster,

The Northrop Team, and Lakeview Title, and content with the fees they paid each party. Had they inquired into that relationship, Lindell Eagan, along with multiple Lakeview and The Northrop Team employees, testified that Lakeview and the other parties freely admitted to having the Marketing Agreement. (Eagan Dep., ECF No. 158-18 at 157; Yungman Dep., ECF No. 158-19 at 179-81.)

The Plaintiffs then argue, however, that the relevant inquiry is not whether the Plaintiffs were aware of a relationship between Lakeview Title and The Northrop Team or the Marketing Agreement, but whether they were aware of the kickbacks. On this note, the Plaintiffs assert that "[t]he Marketing Agreement was designed to look legitimate, so it would not have caused a reasonable person to inquire further, even if the Plaintiffs had known about it." (ECF No. 210 at 16.) This assertion contradicts, however, the Plaintiffs' argument that the Marketing Agreement was clearly a sham for the kickbacks.

The Plaintiffs argue that "the Marketing Agreement itself reveals that it was created solely to conceal the kickbacks." (Pls.' Resp., ECF No. 210 at 20.) They emphasize the fact that the Marketing Agreement begins with the requirement that The Northrop Team refer its clients exclusively to Lakeview, "but then later disclaims any relationship between these referrals and the monthly payments." (*Id.* (citing ECF No. 210-10 at ¶¶ 2.1, 6.1).) Moreover, the Plaintiffs assert that the Marketing Agreement only provided for "unspecified 'marketing services.'" (*Id.* at ¶ 7 (citing ECF No. 210 at ¶ 2.1).) Specifically, the Plaintiffs emphasize that the Marketing Agreement "made no requirements concerning the placement, circulation, volume, size, or medium of the supported advertising." (*Id.* at ¶ 8.) Rather, the only requirement the Marketing Agreement did include was that The Northrop Team website

provide a link to Lakeview, which the Plaintiffs assert was not done until well after this action was filed. (*Id.*) Accordingly, on the one hand, the Plaintiffs argue that had the Plaintiffs discovered the Marketing Agreement, they would not have had reason to inquire further, but on the other hand, argue that the Marketing Agreement was clearly a sham on its face for the above reasons.

The Plaintiffs also argue that the Plaintiffs were entitled to relax their guard because The Northrop Defendants were their fiduciaries, and therefore "the Plaintiffs were permitted to rely on their fiduciaries and not undertake additional inquiry until something excited them to inquire." (Pls.' Resp., ECF No. 210 at 26-28.) This Court cannot ignore, however, that when Patrick Baehr was asked during his deposition whether he believed that the Defendants did anything to affirmatively prevent him from discovering his RESPA claim or otherwise concealed his RESPA claim, he responded "no." (ECF No. 158-4 at 214.) In response to "what efforts did you make to discover your claim after you closed on your home in 2008?" he testified "none." (*Id.* at 206.) Accordingly, even if there were merit to the Plaintiffs' claim that, in this context, the Plaintiffs could "relax [their] guard and rely upon the representations by the other in whom they have placed their confidence" with respect to the Lakeview Title referral, (Pls.' Resp., ECF No. 210 at 27 (citing *Brown v. Neuberger, Quinn, Gielen, Rubin & Gibber, P.A.*, 731 F. Supp. 2d 443 (D. Md. 2010), *aff'd*, 495 F. App'x 350 (4th Cir. 2012)),[18] the Plaintiffs—through the undisputed record and Patrick Baehrs' own testimony—exercised no diligence whatsoever despite the apparent existence of a business

---

[18] Both *Brown* and the other case the Plaintiffs cite to, *Frederick Road Ltd. Partnership v. Brown & Sturm*, 360 Md. 76, 99 (Md. 2000), involved Maryland state law's "continuation of events theory," which specifically permits a statute of limitations to be tolled during the existence of a fiduciary or confidential relationship. *Brown*, 731 F. Supp. 2d at 451 (citing *MacBride v. Pishvaian*, 402 Md. 572, 937 A.2d 233 (Md. 2007)); *Frederick Road Ltd. Partnership*, 360 Md. at 96-97 (citing *W., B. & A. Elec. R.R. Co. v. Moss*, 130 Md. 198, 100 A. 86 (Md. 1917)).

relationship between The Northrop Team and Lakeview Title.

When enacting RESPA, Congress specifically provided that the statute of limitations period would begin to run on "the date of the occurrence of the violation." 12 U.S.C. § 2614. Courts cannot "toll indefinitely the limitations period for claims under RESPA until a lawyer can find the right plaintiff to join a lawsuit and notify other putative plaintiffs" because doing so "would effectively write the statute of limitations out of RESPA." *Cunningham v. M&T Bank Corp.*, 814 F.3d 156, 164 (3d Cir. 2016). Plaintiffs have not demonstrated that their case presents the "rare instance" where enforcing RESPA's statute of limitations would be unconscionable. Therefore, even if the Plaintiffs had standing to bring their claim, the claim would be barred by the statute of limitations and equitable tolling does not apply.

## CONCLUSION

For the reasons stated above, Defendants' Joint Motion for Summary Judgment (ECF No. 158) is GRANTED and Judgment is ENTERED in favor of Defendants. A separate order follows.

Dated: December 7, 2018

_____/s/_____

Richard D. Bennett
United States District Judge